May I please the Court, Sharon Ben-Shahar, on behalf of Petitioner Lee Robbins. Petitioner Robbins has been in prison for over 20 years. His conviction and appellate proceedings were riddled with constitutional errors. I would like to focus my argument on two of them, one in the trial court proceedings and the other one in the appellate proceedings. The trial court proceedings were compromised by several Brady violations, including the failure to produce the victim's rap sheet, the ballistics report for the murder weapon. Pardon me, counsel, how is that relevant? There was no claim that this was a voluntary manslaughter. This man claimed that he wasn't there. He didn't do it. So why would you want to be submerged as a victim? The petitioner didn't put on any defense at all. So there was no evidence that was presented by him that would have contradicted the self-defense argument. Well, yes, exactly. But he didn't put any evidence in of self-defense or even of voluntary manslaughter. So his not guilty plea was equivalent to saying, I didn't do it. I believe the law is that if Brady material is not produced... It's not material. It's not material to the case. I didn't mean material in the sense of materiality. If Brady evidence or if evidence is not, if exculpatory evidence is not produced to the defendant in the face of a particular request for that evidence... What is exculpatory about the victim's rap sheet if there is no evidence of self-defense or voluntary manslaughter? And what is the prejudice that would support granting habeas? The rap sheet would have also substantiated the fact that the victim had other enemies and would have supported an argument that maybe somebody else committed the crime other than the defendant. And the district court reached the conclusion that, or rejected the magistrate judge's conclusion, that the only inference that can be drawn from the rap sheet is inculpatory. That finding is not, was not appealed. In addition, there was also... That last part. What's to appeal from? Precisely. That was the district court's finding, and there was no cross-appeal on the issue. There's nothing to cross-appeal. There's not a judgment in favor of your client. A specific factual finding along the way doesn't become the subject of an appeal. Okay. In addition, there was... Well, this was a circumstantial evidence case. Right. There was no physical evidence to connect your client to Robbins. To the murder. To the... Your client was Robbins. To connect your client to the murder. Correct. There were also the coroner's documents, which I think is the most... The murder weapon was found at his brother-in-law's house. And there was no evidence of any ballistic report. Well, whether or not there was a ballistic report remains a question because we were never given... We were never given discovery on this issue. Did you ask the officer whilst he was on the stand whether he had prepared a ballistic report? I don't... The officer testified and the state presumes that, or the magistrate judge also presumes that he was relying potentially on notes that he had, but no one ever mentioned a ballistic report. Including defense counsel didn't ask him, did you prepare a ballistic report? There was no defense counsel. My client was not represented during the... He was there. He was representing himself. Did he ask the officer, did you prepare a ballistic report? No, he didn't. Most disturbing are the coroner's documents who would have established that the murder occurred at 10 p.m. when Mr. Robbins was far away from the scene of the crime as established by both... And what prospect is there that anybody, a find or a fact, would decide that the crime or the death actually occurred at that time? As opposed to having an entry on the coroner's report at that time. We're talking about four different documents, a death certificate, a GSR data sheet, a case reported sheet and the coroner's investigative report. And are they all independently prepared or is the same person doing all of them? Well, there's an indication that two of them were prepared by Detective Linder and the other two, one of them has a different name on it, but has the name Linder scribbled somewhere in the form, but a different person actually prepared it. The fourth document has no indication of who actually prepared it. Each of these documents independently shows that the time of the shooting was 10 p.m. And is there any real chance that a try or a fact would reach that conclusion? I mean, wasn't the evidence that the shooting actually took place several hours before kind of overwhelming? I don't believe so. I think the evidence was weak and circumstantial. About when the shooting took place? About when the shooting took place. I mean, it's not just circumstantial. A lot of people talked about when they heard it. Well, they heard a gunfire. By 10 p.m., the bodies had been found and the people were dead. I mean, the victim was dead. That's not clear from the evidence either. There's evidence that the victim's roommate arrived at the scene, he testified at trial, that he arrived at the scene at 8.30. That contradicted his prior testimony or his prior statement to the police that he actually arrived at the scene closer to 10. It also contradicted his companion's statement to the police that they both arrived at the scene closer to 10 p.m. The earwitnesses that testified that they heard gunfire at 6.30 also testified gunfire on New Year's Eve wasn't an unusual event. So there was, and there was other, there were other places where there were holes in the case of the prosecution. So overall, this case was not a close case. It wasn't a, there wasn't overwhelming evidence, and I believe that this evidence would have made a difference. And the other point I want to make is that we're not required to show by a preponderance of the evidence that the result would have been different. All we need to show is reasonable probability. Evidence contradicting the government's theory of the case and providing the defendant with an alibi, at the very least, provides a reasonable probability that the result would have been different. The other point that I'd like to talk about is the failure to follow a proper Wendy procedure in the appellate court. The appointed counsel in this case attempted to follow the procedure pursuant to Wendy v. California, but he didn't do that. Wendy requires appointed counsel to provide a brief summarizing procedural and factual history of the case with citations of the record and to provide the entire record to the court of appeals for its own independent review. That never happened in this case. The appellate counsel never provided the entire record. He omitted important transcripts and court filings that pertain to some of my client's most important claims, including his repetitive request for advisory counsel, which the district court found was a non-frivolous issue that should have been raised on appeal. Now, when Wendy is not followed, I submit that prejudice should be presumed. The district court acknowledged the fact that Wendy wasn't followed, but found that there was no showing of prejudice. Prejudice should be presumed pursuant to the same logic that is a basis of the court's decision in Penson v. Ohio, the Supreme Court's decision. In Penson v. Ohio, the Supreme Court held that when the Anders procedure is not followed, the prejudice must be presumed. Anders and Wendy are designed to protect the same rights to counsel of a defendant who has his counsel file a no-merit brief. So the same rule of no requirement for showing of prejudice should apply to a violation of Wendy. The district court sought to distinguish Penson on the ground that counsel there was permitted to withdraw before a finding that there were no non-frivolous issues was made by the court. That distinction is not well based because, first of all, in Penson there were two distinct violations of Anders that the court discussed. One was the failure to raise any type of issue by counsel, any type of non-arguable issue by counsel to the appellate court, and two was the fact that the appellate court granted counsel's motion to withdraw before reviewing the entire record. And each of these issues independently provided the court with sufficient basis to grant habeas relief without requiring a showing of prejudice. Why? Because... I mean, you now presumably have access to the complete trial record. What was missing? I'm sorry? Okay, we now have. We're on an appeal of the habeas denial. We're kind of past the point of the record not being available to the California Court of Appeal. What in that additional record that should have been submitted would have made a difference? Well, first of all, the district court specifically found that the issue of the court's failure to adequately consider petitioner's request for advisory counsel was a non-frivolous issue that should have been raised on appeal. Now, put that aside. The issue here is the failure to follow the safeguards that are designed to protect the petitioner's right to counsel. Both Wendy and Anders strike a balance between the petitioner's right to counsel and right to have a merits brief on all of these non-frivolous issues, and the state's interest in not subsidizing frivolous representation for frivolous appeals. That balance is maintained if the procedure is followed. If the procedure is not followed, the balance is not maintained, there is no assurance that the petitioner's or the defendant's right to counsel was preserved. This is all theoretical. Is there anything specific that was missing from the record that would have made any difference? Well, the example that I'm giving you are those filings and court hearings that pertain to the issue of the state court's failure to properly consider petitioner's request for advisory counsel. That issue was decided to be a non-frivolous issue by the district court. At the very least, that issue should have been raised. The failure to raise, the failure to, I'm sorry, at the very least, that issue should have been included in the record. The record didn't also contain a variety of other issues, such as petitioner's various partisan motions, his attempt to serve subpoenas, the court's concession to serve subpoenas on his behalf that actually were never served at the end, his request for additional money for investigation, his request for a forensic evidence, all of these transcripts were not made part of the record that the court of appeal reviewed. And so the court of appeal was never really able to make an informed decision that there was a non-frivolous, there were no non-frivolous issues and dismiss counsel from his representation of my client. Okay. Thank you. I'd like to reserve a minute for the rebuttal, please. May it please the Court. With respect to the Brady issues in the case, I'd like to address them seriatim, beginning with the Rafshe claim. Do you want to give your name for the record, sir? I'm sorry, Your Honor. May it please the Court. Keith Forthorn, Supervising Deputy Attorney General for the Warden. Yeah, here he is. Keith Forthorn, Supervising Deputy Attorney General for the Warden. I'd like to begin with the Brady claims, Your Honor, in response to counsel's arguments, beginning with the Rafshe claim. As the Court has already recognized, there was no issue with respect to the Rafshe that entitled the petitioner to discovery at trial. With respect to that, as already recognized, the claim was that the petitioner was not present at the scene of the crime. How was that claim made? Was that in final argument, or did he say, I didn't do it, I wasn't there? It was made repeatedly throughout the trial. It was made pre-trial. It was the focus of the Marsden motions because Petitioner's Clement was his defense. Let's talk about the trial. At trial, did the defendant stand up and say in opening statement or at any time, I didn't do it, I wasn't there? Exactly. His argument to the jury was he wasn't present. The people had failed to prove their case beyond a reasonable doubt. He hadn't testified. He did not testify. So it was inferential. So he was allowed to argue to the jury that the evidence was insufficient to show that he did it. Exactly. And that's the argument he made. That's the argument he made. He didn't present any evidence, but that was the argument he made to the jury in closing argument. And it was, but as also was pointed out, at the time he made his discovery motion, the trial judge explained to Petitioner that it could only be used for impeachment purposes, but the victim was dead. And so there was no, and only if they were felonies. And there was an indication that there was an arrest with respect to the victim involving a domestic violence issue. And the trial court asked Petitioner to explain how that would be material. Petitioner then withdrew the motion. So it was withdrawn. And I would add that in cross-examination. Let me ask you this. You know, like on a rap sheet, the person says, well, I wasn't there. I had nothing to do with it. And this is a case where all the evidence is circumstantial, right? Right. Okay. And there's no physical evidence to connect Robbins to this murder, is there? When you say physical evidence? Physical evidence, you know. Well, there's the murder weapon, which was conclusively shown to be, you know, in his possession at one time. If that's what you mean by physical evidence. But beyond that, yes, the case was circumstantial. The murder weapon was found at his brother-in-law's house, wasn't it? Yes, correct. And who was that weapon registered to? There was no evidence presented as to who it was registered to. Mr. Lee, who was his brother-in-law, said it was his gun. Said it was whose gun? It was Mr. Lee's gun. And he testified that he had kept the gun in a safe in his garage to which Petitioner had access to and would have been aware of the combination. All right. So you had the gun. Now, you had the bullet, right? You had the bullet. There was a bullet. There were five of them. Five bullets. All five went through the victim. Two ended up in the wall behind him. Three ended up in his body. All five produced at trial. Yeah. Now, were ballistic tests done? Yes, I think the record shows that ballistic tests were done. So why wasn't that ballistic test turned over as braiding material? It was, and I can direct the court to parts of the record where it shows it was turned over. It was in Petitioner's possession. When was it turned over? Prior to trial, and then Petitioner lost it, and then he asked for another copy of it, and it was returned. So the Petitioner had the ballistics test? Right. First off, I'll read to you from the record, and this is the excerpt of record at 790. I'm reading from his hitch motion. I'll tell you so we understand each other. One of the things that I'm concerned with is the failure of the prosecutors generally to turn over braiding material. We have a lot of problems with that. All you have to do is read the cases. So I'm just asking you about braiding material. Well, that particular subject was covered a number of times. First, with respect, during the Marsden motions, Petitioner complained about braiding material, discovery not being turned over. Well, no, there's certain things. The ballistic report was turned over to him, huh? Yes, and if you look at his pro per motion, as I was going to read to the court, and again, this is at ER at 790, he's complaining about an item of evidence here, and this is at the top of that page. Page one, item number two, evidence held. Two expended .38 caliber slugs recovered from the north dining room wall. Referred to Van Horn's report for exact location in crime lab receipt number H07502. This is in Petitioner's handwriting. He says, neither the crime lab receipt or Deputy Van Horn's report show these recovered bullets. So in his own writing, he says he's read the report. Now, let me ask you this. What did the report show? Well, according to Deputy Van Horn, it showed conclusively that the bullets, all five bullets that were recovered from the crime scene came from Mr. Lee's gun. Mr. Lee's gun. Yes, which was missing, which was stolen and returned to his safe before and after, shortly after the murder occurred. Did anybody testify that they'd seen this gun in the possession of defendant? The gun was a .45 caliber, not this gun, but within, shortly before the time of the murder, at about 530. The murder was alleged to be between 6 and 630. He's five blocks away at his sister's house. Who is he? I'm sorry. The Petitioner's five blocks away at his sister's house where a Navy ordnance man is handed by Petitioner a .45 caliber Colt commander. That's loaded, well, they say loaded at the trial. A Colt commander handed to him for examination. He testified that the murder weapon, People's Exhibit 3, was very similar to the weapon he was shown. Okay. I'm a little confused because in your brief it says there's no evidence that a ballistics report existed, and that was the basis for the district court's denial. And now I'm hearing from you there was a ballistics report and it was all turned over. Well, I only discovered this as I was assigned to orally argue this case, and I'm correcting the record. Well, you didn't tell us that, did you, that you're correcting the record. Oh, I'm sorry. No, but I read the same thing. Well, the brief is also that there's no reason to believe it was material. Well, but, you know, that's a different story. I mean, can you really imagine a murder trial where there's a gun used and the gun is found in possession of a brother-in-law and bullets are there where there'd be no ballistics report? Well, there was one. But that's with the records. And I'm correcting the record, Your Honor. Well, all the argument I see here is based on the ballistics report didn't exist. I don't see an argument, at least in the two pages under the heading, the ballistics report, that it was not the denial of that report or the failure to turn it over was not prejudicial. Certainly not an argument that it was turned over. So I'm not sure. Well, I mean, I'm telling you. Let's stop with the brief that somebody else wrote. I understand that. This isn't you. But the district court, it denied it based on the proposition that the petitioner hadn't established that such a report existed. So how can it be a violation if the report doesn't exist? Now you tell us the report does exist. Well, it looks like from the record it was turned over and he had it. I mean, is that a Brady claim where the prosecution turns over the report? Well, it means the district court denied it on the wrong ground. Well, that's true. But you have the power to affirm. Yeah, but when did you find out about this ballistic report? Well, I don't know that it exists, but I'm telling you what I see in the excerpts of record. That I learned of this week. Over the weekend as I prepared for this argument. Over the weekend you found out that there was a ballistic report. Well, I'm telling you what I see in the excerpts of record. Do you have the report? No, I have no idea if there ever... Well, then how do you tell us that the bullets that they took out fit the brother-in-law's gun? Because... I mean, you're not being open with us. I'm sorry, Your Honor. You're asking me why I say that, and I'll tell you why I say that. It's because it's based on Deputy Van Horn's testimony. He testified at trial, which we did point out. But you implied to me, when you were talking to me, that you had a ballistics report. I'm telling you the record... I'm sorry if I misspoke. If I misspoke, I apologize. What I'm trying to establish... Did you call to see whether there was a ballistic report this morning? No. Why not? I mean, you read... So you wait till over the weekend to read the record. And then you discover there was a ballistic report. And we spend a lot of time going through all of this. And we don't even know it's a ballistic report. All we know is it's Van Horn's report. Van Horn was the investigating officer. Well, that's true. But let me... There's a discovery motion that was... We have a lot of faith in the Attorney General's office when we see things like this going on. Well, I'm the one that's bringing it to your attention, Your Honor. Yeah, but you should have brought it to our attention earlier. Well, I'm not doubting that. I'm not doubting that, Your Honor. You know when we get these records? Six weeks earlier, we start working on them. Well, this is in the excerpts of record, which is before you. But it doesn't say anything about a ballistic report. It says Van Horn's report. It could be the report of the officer. It could be an incident report. Well, I'm looking at the discovery motion. That may be, but I'm telling you what's in there. But let me tell you what I... As I was looking through the record, there's a discovery motion. And going over the discovery motion, it says, A copy of Van Horn's test results and the murder weapon, the victim's gun with covered bullets. Mr. Fagan, this is the prosecutor. That report, as well as others Mr. Robbins asked for in this request, were provided to him. And then I don't have another copy with me today, but if you can't find them, I'll make him another copy. If I don't have those today, I'll make a copy for later. What are you reading from, counsel? This is the RTF page 68. I would appreciate copies of those. The court, do you have a copy? Defendant, I never received a copy because I have the copy. The police report that I'm requesting was destroyed in jail. I do need another copy. Mr. Fagan, who's the prosecutor, says, I will make another copy. Then, right before the trial starts, it's on August 20th,  Your Honor, could the record reflect that I am handing Mr. Robbins a copy of the police report that he lost? That's the police report. Where's the ballistic report? Well, that's how I interpret it, Your Honor. And if it's not, if that's not how you interpret this, I, that's, it's the subject. Can I tell you something? Yes, Your Honor. What happened to me in a trial when I presided, huh? From the files of the attorney general, there was a newspaper article, and this was a big drug case, to show that a certain transaction occurred on a certain date on a certain year because the statute of limitations was involved. So I was handed a document that was a newspaper story that the attorney general's office had that said, well, look, here it is, Judge, this place, this document referred to a certain program that was going on at this bar. Some rap deal was going on over there. And it is within the five-year statute of limitation. So I look at it, and I said, well, I don't see a date up here. It was from the Sentinel, the newspaper, the Sentinel. Well, oh, I guess the Xerox did it correctly. And so I asked someone, one of the detectives, or I said to the prosecutor, you know, they keep these things in the newspaper office, and they have this morgue, so maybe you better send, I knew this sergeant from the old days, have him go over there and check it. Well, he sent somebody else. In the meantime, the defense attorney went over to the newspaper and got the exact copy, and it was a year earlier, so the statute had run. And the investigator that supposedly went over there came back and testified that he did go there, and he asked the girl at the desk, huh, now you keep these old newspapers? And she said, no, no, don't bother me. So he leaves, and he reports to the court that they don't have copies. But the defense attorney goes over there, takes them back, whatever it was, and he comes up with a copy, and it's the statute had run a year earlier. You know, these things happen. You can't assume because it's handed to you by the attorney general's office and it doesn't have a date that somebody just didn't Xerox it properly. The problem is a petitioner with that can cope. And the other fact was that that place was shut down a year earlier, and the person that shot it down was the lead officer in this case, an LAPD sergeant. He just sat there and didn't say a word. Well, Your Honor, my point is just that the issue was flagged. The prosecutor promised on the record to give him what he asked for. There's an on-the-record general statement of discovery compliance. You said you had the ballistics report. You didn't tell me at first you had it, but you said there's a ballistics report. And again, I apologize for that misstatement, but I'm just drawing the court's attention to what appears to be discovery compliance that I felt informs the issue. Yeah, but he never even got the coroner's report. The coroner's report was what you're talking about. That's Brady material? Well, actually, as I understand the claim on appeal, it's a failure to obtain the coroner investigator's report as opposed to the coroner's report. The coroner testified, and her report from the autopsy was used by petitioner in cross-examination. Their complaint, I think, centers on a coroner investigator who appeared at the scene of the crime and a GSR paper that was signed by Mr. Linder. We're talking about two separate things, as I understand the claim. Isn't that all Brady material? You have people say, well, I heard shots at 6 p.m. Well, nobody called the police or did anything. There was a lot of shots fired, but they all heard shots at that time. And so the time of death was important. And then you have whatever these documents are that were in the possession of the state. They show it was 10 o'clock, four hours later. Well, we have the documents in the record, and we know what they say. And this is the investigator. Well, was that Brady material or not? I am sure it's Brady material. But it wasn't turned over. Well, that was the allegation, and it was resolved by the district court by looking at the document itself and determining it wasn't material. Well, come on now. If the time of the murder, that's not material, and then you get coroner's reports that say the time of death was four hours later. Well, then perhaps we should read what the report says. It says, synopsis, information source, LASD homicide detective Cox, investigation at 0205 hours 1189. I responded to 124 Gadwell and Lakewood. I contacted Detective Cox, who advised at about 2200 hours 1231-88, the decedent was apparently engaged in an exchange of gunfire with an unknown assailant. That's the material. At 2200 hours, but there are other documents in here. That's a statement from Detective Cox. Detective Cox testified at trial. He testified he didn't even arrive until 11 p.m. that evening. What difference does it make? But he has the time of death at what time? He has it at 2200 hours. Well, okay, but that's Brady material. You know, I've had other cases where we've had coroners that set the time of death. I can give you the site to the case. The time of death, one coroner set it at one time. Another coroner set it a day later. You know? Detective Cox was also aware that the neighbors... But that's Brady material. You're supposed to turn it over. I'm not disputing that. You're supposed to turn it over. I'm not disputing that, Your Honor. All right, so you're admitting error and not turning it over. No, Brady material has two components. So you're telling me that the date of time of death is not material. Is that what you're telling me? No, I'm not saying the time of death is not material. I'm saying the information in this report is not material. Why? Why? Wasn't it prepared in the ordinary course of business by a public official? A hearsay statement from Detective Cox to a coroner investigator that the shooting appeared to occur at 2200 hours is not material in light of the other evidence presented at trial, which is three neighbors who all testify that the shooting occurred between 6 and 630. And they never reported it. They said there was other gunfire going on in the neighborhood. And yet the actual testimony from two of the witnesses was that the only gunfire early in the evening between 6 and 630 was the shots heard. Two sets of shots, one which was rapid fire, loud, and two or three seconds after that, a series of rapid fire, more muffled sounds, which is consistent with the prosecution's theory of the case, that Petitioner shot from outside the victim's house to kill the victim, who then returned fire inside the house. All three of the witnesses from the neighbors, the neighbors, the next-door neighbor, the neighbor next to her, and the neighbor down, four or five houses down, all testified at that time. But it's still relevant to an issue in this case. That report, it's material. You know, it could influence a jury. The definition of materiality is... Is whether it's reasonably possible it would have influenced... Reasonably possible, yeah. Reasonably probable. It's not reasonably probable, Your Honor, that a jury would have found a hearsay statement... Because you say so. You say so, it wasn't reasonably probable. I mean, you know, there's just no respect for these decisions like Brady. No respect for that obligation. Who was Curatola? Curatola is the victim's roommate who discovered the body between 8 and 8.30, according to his trial testimony. So that was after 6.30 and before 10? That's correct, Your Honor. Thank you. I'm looking for these other documents. Let me look over here. Hold on. In ER 1034 and 1031 are the other two documents, Your Honor. Well, I have certificate of vital record. Certificate of death. And let me see. Okay. Okay, it says here, homicide, residence. It's hard to read. It says no... Okay, then it gives date of death. December 31, 1988, hour 2200. That's on the death certificate, 2200. You seen this? Yes, I've seen it. And the prosecutor said he did not... The death certificate is not the ordinary part of his prosecution's file. But it's part of the file. It may not be part of the prosecution's file, but it's available to the prosecution. You can't say, well, if you're the prosecutor, you can't say, well, some investigator's got the file and I didn't bother to ask him about it. You can't do that. You have to look at it in one unit, see? One unit. So here it is. The problem with that document, as with the other documents... Well, did you tell us about this document? Do you know about this document? Yes. It's discussed in the briefs. It's discussed by the district court. It was discussed in the briefing before. There was... That's what it says. But was this provided? Was this provided to the defendant? The Brady material? Mr. Fagan, the deputy district attorney at trial, submitted a declaration to the district court stating that the death certificate was not something he normally obtains as part of his investigation. It's normally not available to him. And the answer is no. And the answer is no. Well, they start off with no. They start with, it's a public record. I can go get it, right? Then that's not a Brady violation. No, it's a public record. The withholding of public documents is not a Brady violation. Well, that may be an argument. Yes, sir. But this was something... You've got a case that said withholding... You know, here it is. This was in your possession. And there's the coroner's investigation report. The basis for the district court's rejection of this whole argument was not based upon a determination that material should not have been turned over, I take it. It was based upon that these documents would not have made any difference. Is that correct? That's correct, Your Honor, as I indicated earlier. This document would not have made a difference? When was that ruling made? That's page 53 and 54 of the magistrate's report and recommendation. Well, that's the magistrate's report and recommendation. Which was adopted by the district court. Yeah. That's correct, Your Honor. And that's my position here. But that's looking at it several years later, you know. You're supposed to turn this over. I can't think of any theory where that would have persuaded a jury when it's reasonably plausible that this piece of paper, any of those sheets of paper, would have made a difference in this case. Well, you never know with a jury what's going to make a difference or not. No, I can't conceive of any. Well, I can conceive of it. Well, the test is reasonable probability. Huh? The test is reasonable probability. And in light of the three eyewitnesses who were all unequivocally stated that the shooting occurred at 6.30 and there was no further shooting until after midnight or firecrackers until after midnight, which is critical because that's post the 10 o'clock allegation. That's a fine argument on this. But you have the Brady rule. You're supposed to turn it over. That's the first part of Brady. And the second part is materiality. You don't have a Brady violation if it's not material. It's not a prejudice component. It's a materiality component. It's part of it. It's a constitutional error. That's all I'm saying. You just hold it all back and you wait until the trial's over? And you say, well, he's guilty anyway, so what the hell difference would it make? Brady says that prosecutors should not play fast and loose and hope that that's the case and they should turn over everything. And you're absolutely right. But the test for a constitutional violation is whether it's material, reasonable probability. That's all I'm saying. Are you proud of the way this Brady material was handled in this case? Well, Your Honor, the difficulty I'm having answering that question is we don't know if it was actually withheld because there was no evidentiary hearing below. And the basis of the district court's decision was to resolve it on the second prong of Brady. So I can't tell you what I'm proud or not proud of. But I have every reason to believe the prosecutor in this case, because he filed a declaration under oath saying he fully complied with his discovery obligations, that he did. And if we were ever to have an evidentiary hearing in this case, we'd put Mr. Fagan on the stand and he'd put his word up against petitioners that he turned over every last piece of paper in this case. Well, then we ought to have that hearing. Well, you don't need to, given the basis of the ruling of the district court. But I'm just explaining. You're asking me what I knew. And I told you we haven't reached that question yet. Of course, the case hasn't gone that far. Because you don't need to. You can resolve it. Counsel, you're 20 minutes over your time. I'm sorry, Your Honor. With that, I would respect to submit. All right. Thank you. I don't think you need to say anything more, do you? We're all, what? I just want to briefly address a couple of points that were discussed. All right. Two minutes. Okay. With respect to the ballistics report, there is a declaration in the record by the petitioner that he never received any ballistics report. That's a record page 658. The question is, if there was a ballistics report and the state said he lost it, why didn't the state provide him a copy? That question was never answered. Actually, we were told that they did. Another copy upon his request. There's no evidence that they did. I mean, this is the first time that I hear that the report ever existed. Counsel also mentioned that the murder weapon was conclusively shown to be in petitioner's possession at some point. The only link between petitioner and the murder weapon are statements made by his brother-in-law, Richard Lee, that initially lied to the police and hid the murder weapon and then blamed it on petitioner. This is only at best evidence of access and certainly not that the weapon was in fact in petitioner's possession. In terms of the weapon that was shown. Was there fingerprints of the weapon taken? This is a very good question because the fingerprint person was one of the deputies that my client wanted to subpoena as a witness at trial. He asked the court to subpoena or prepared subpoenas, asked the court to serve those subpoenas. The court said that that would be taken care of. But then it never happened. So there was no fingerprint evidence at trial. The weapon that was shown to be in petitioner's possession on the day of the murder was different than the murder weapon. It was a .45 caliber, but it had a blue and alloy handle. The murder weapon was black. And the murder weapon was a .38 caliber? No, it was .45 caliber, but it was black. They're both .45 caliber. The same caliber, but not the same weapon. Who testified about the murder weapon, the appearance of the murder weapon? I'm sorry? Who would have been able to testify about the appearance of the murder weapon? There was testimony that prior to the murder, petitioner went to his sister's house and encountered her friend. He showed two guns that were in his possession. One was a .38 caliber. The other one was a .45 caliber. But the .45 caliber looked different. According to the testimony of that witness who testified on behalf of the government, the person that was at petitioner's sister's house, the weapon looked different than what the government presented as the murder weapon. In terms of the coroner's documents, the investigative report also contains- Who was the manufacturer? A Colt commander. And who was the manufacturer? In both cases, it was a Colt commander, but different color. The investigative report, the state argues that it relies exclusively on hearsay. The investigative report also lists important forensic evidence, such as the body temperature, which presumably, I think we can safely assume, was consistent with the hour of death or the time of the shooting that's listed in the report. And that's another point I want to make is that it's not just the time of death. It's the time of shooting that is listed in three of the four reports. And in addition to that, there is nothing in the other three documents that were withheld to suggest that they are based on hearsay evidence. They're all documents that were prepared by the coroner's office, official documents, and there's no reason to believe that none of them was based solely on hearsay. Certainly, three of them do not indicate that they're based on hearsay. I understand in theory, but in fact, nobody thinks the coroner was there. The coroner was there. He wasn't there when the shooting took place. Oh, no, the coroner investigated. The coroner doesn't say he was there when the victim died. The coroner tested the body, and there's a number of findings listed in the investigative report, including the softness of the tissue, the liver temperature, all of these findings, with the time of death that was indicated by the coroner as being 10 o'clock p.m. Judge Bea asked about Curatola's testimony. That's the roommate. Curatola testified at trial that he arrived at 8.30, but his testimony is inconsistent with his initial statement to the police that he arrived at the scene at 10 p.m. Unless your honors have additional questions, that will conclude my argument. Thank you. You did a very thorough job. All right. This concludes the answer.
judges: Pregerson, Clifton, Bea